**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| HYOSUNG TNS, INC., | |
|     Plaintiff, | |
| v. | Civil Action No. 3:16-CV-364 |
| DIEBOLD NIXDORF, INC., | |
|     Defendant. | |

## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(6)

## CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.    PROCEDURAL BACKGROUND.........................................................................3

III.    LEGAL STANDARD............................................................................................4

      A.    Motions To Dismiss................................................................................4

      B.    Indefiniteness and Claim Construction....................................................5

      C.    Effect Of Prior ITC Actions And Appeals...............................................7

IV.    ARGUMENT ........................................................................................................8

      A.    Indefiniteness Cannot Be Resolved On The Pleadings Where, As Here, There Are Factual Disputes ....................................................................8

      B.    The Federal Circuit's Decision Confirms That Different Evidence Could Warrant A Different Outcome ...............................................................10

      C.    Hyosung Will Submit Precisely The Evidence That The Federal Circuit Found Lacking In The ITC Record.........................................................13

      D.    Hyosung Properly Pleaded Infringement...............................................19

V.    CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) ........................................................................9, 20

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
   811 F.3d 1334 (Fed. Cir. 2016) ......................................................................1, 6, 9

*Alloc, Inc. v. Norman D. Lifton Co.*,
   No. 03 Civ. 4419 (PAC), 2007 WL 2089303 (S.D.N.Y. July 18, 2007) ............9, 12

*Alloc, Inc. v. Pergo, Ltd. Liab. Co.*,
   No. 00-C-999, 2009 WL 1939034 (E.D. Wis. July 2, 2009) .............................9, 12

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) ...........................................................................6, 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................5

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ...........................................................................6, 9

*Cox Commc'ns, Inc. v. Sprint Commc'n Co.*,
   838 F.3d 1224 (Fed. Cir. 2016) ...............................................................................6

*Diebold Nixdorf, Inc. v. ITC*,
   899 F.3d 1291 (Fed. Cir. 2018) .................................................................... *passim*

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
   809 F.3d 1223 (Fed. Cir. 2015) ...............................................................................5

*EON Corp. IP Holdings LLC v. AT & T Mobility LLC*,
   785 F.3d 616 (Fed. Cir. 2015) .................................................................................6

*H-W Tech., L.C. v. Apple, Inc.*,
   No. 3:11-CV-651-G, 2012 WL 959316 (N.D. Tex. Feb. 23, 2012), *accepted*
   2012 WL 923751 (N.D. Tex. Mar. 19, 2012) ................................................ *passim*

*InterDigital Commc'ns, Inc. v. ZTE Corp.*,
   711 F. App'x 998 (Fed. Cir. 2017) ........................................................................12

*Leal v. McHugh*,
   731 F.3d 405 (5th Cir. 2013) ...............................................................................4, 5

*Lifetime Indus., Inc. v. Trim-Lok, Inc.,*
  869 F.3d 1372 (Fed. Cir. 2017).............................................................................19

*Nalco Co. v. Chem-Mod, LLC,*
  883 F.3d 1337 (Fed. Cir. 2018).............................................................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
  572 U.S. 898 (2014)..................................................................................................5

*Powertech Tech. Inc. v. Tessera, Inc.,*
  660 F.3d 1301 (Fed. Cir. 2011)...............................................................................7

*Skky, Inc. v. MindGeek, s.a.r.l.,*
  859 F.3d 1014 (Fed. Cir. 2017)...............................................................................5

*Solomon Techs., Inc. v. Toyota Motor Corp.,*
  No. 8:05-cv-1702-T-MAP, 2010 WL 715243 (M.D. Fla. Jan. 26, 2010)................9

*Sosa v. Coleman,*
  646 F.2d 991 (5th Cir. 1981) ..................................................................................5

*Tandon Corp. v. U.S. ITC,*
  831 F.2d 1017 (Fed. Cir. 1987)...................................................................1, 7, 10

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
  135 S. Ct. 831 (2015)........................................................................1, 2, 7, 12

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.,*
  90 F.3d 1558 (Fed. Cir. 1996)..................................................................... *passim*

*Thomson Consumer Elecs., Inc. v. Innovatron, S.A.,*
  3 F. Supp. 2d 49 (D.D.C. 1998) ..............................................................................9

*Williamson v. Citrix Online, LLC,*
  792 F.3d 1339 (Fed. Cir. 2015)...............................................................................5

*Zeroclick, LLC v. Apple Inc.,*
  891 F.3d 1003 (Fed. Cir. 2018)........................................................................6, 10

## STATUTES

19 U.S.C. § 1337................................................................................................3

28 U.S.C. § 1659................................................................................................3

35 U.S.C. § 112........................................................................................ *passim*

35 U.S.C. § 282................................................................................................5

Leahy–Smith America Invents Act, Pub. L. No. 112–29, § 4(e), 125 Stat. 284 (2011)..................................................................................................................................6

## RULES

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 4, 5

Fed. R. Civ. P. 15(a)(2)..............................................................................................4, 20

## OTHER AUTHORITIES

U.S. Patent No. 8,523,235.................................................................................... *passim*

## I.       INTRODUCTION

With its Motion to Dismiss Under Rule 12(b)(6) (Dkt. 48 ("Motion")), Defendant Diebold Nixdorf, Inc. ("Diebold") asks the Court to resolve disputed facts in its favor and find the patent claims invalid on the pleadings.  In particular, Diebold argues that the Court should dismiss the case because the asserted patent—U.S. Patent No. 8,523,235 ("'235 Patent")—is purportedly invalid as indefinite under 35 U.S.C. § 112.  Patent indefiniteness is not an issue properly addressed on a 12(b)(6) motion in this case.  The Motion should be denied.

First, the indefiniteness inquiry—which depends on construing the claims to determine their meaning and scope—can (and in this case does) require the Court to resolve underlying factual disputes.  *See*, *e.g.*, *Teva Pharm. USA, Inc. v. Sandoz, Inc*., 135 S. Ct. 831, 841 (2015); *Akzo Nobel Coatings, Inc. v. Dow Chem. Co*., 811 F.3d 1334, 1343 (Fed. Cir. 2016).  Such disputes cannot be resolved against the non-movant on a motion to dismiss.  Tellingly, Diebold fails to cite a single case granting a motion to dismiss on the basis of indefiniteness.  This is not surprising because this District has held that adjudicating indefiniteness on a motion to dismiss is premature and therefore inappropriate.  *H-W Tech., L.C. v. Apple, Inc*., No. 3:11-CV-651-G, 2012 WL 959316, at *3-4 (N.D. Tex. Feb. 23, 2012), *accepted* 2012 WL 923751, at *1 (N.D. Tex. Mar. 19, 2012).  In fact, the cases Diebold cites confirm that indefiniteness is properly addressed—at the earliest—in the context of claim construction proceedings or on summary judgment.

Second, Diebold argues that the Federal Circuit's decision in *Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1300 (Fed. Cir. 2018)—reversing the United States International Trade Commission's ("ITC") finding that the '235 Patent was not indefinite—"require[s] this Court to find that the '235 Patent is invalid" as indefinite. (Motion at 12.)  Diebold is wrong.  It is well-established that "appellate treatment of decisions of the [ITC] does not estop fresh consideration by other tribunals." *Tandon Corp. v. U.S. ITC*, 831 F.2d 1017, 1019 (Fed. Cir. 1987) (citation

omitted).  And the Supreme Court and Federal Circuit have long recognized that different facts in different cases can lead to different outcomes even when the same patent and defense are at issue in both cases.  *See, e.g.*, *Teva*, 135 S. Ct. at 839 ("divergent claim construction[s]" can stem from "divergent findings of fact"); *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1570 (Fed. Cir. 1996) (affirming this District's non-infringement finding despite Federal Circuit's decision affirming ITC infringement finding).

Moreover, the Federal Circuit's decision in *Diebold* itself refutes Diebold's argument.  The Federal Circuit did not hold that the '235 Patent would be indefinite on *any* factual record.  To the contrary, the court identified and discussed the type of evidence that was absent from the ITC record that, if present, could impact the outcome on indefiniteness.  Such evidence includes a showing that (1) skilled artisans understood that the claim term "cheque standby unit" denotes a specific "structure or class of structures" or "devices or class of devices," such as "escrow units," (2) skilled artisans understood that those structures or devices could be made with "'well-known components,'" and (3) "'escrow units' … existed or were well known as of the date of the application for the '235 patent."  *Diebold*, 899 F.3d at 1300 & n.4.

What the Federal Circuit identified is precisely the type of evidence that Plaintiff Hyosung TNS, Inc. ("Hyosung") will present here.  Consistent with the practice in this District and Diebold's own cited cases, Hyosung expects that the factual issues relevant to the indefiniteness defense will be litigated in the context of claim construction proceedings or summary judgment. Resolving them now at the pleading stage would be premature and inappropriate.  But, to show that those issues are real, not merely hypothetical, Hyosung is providing a declaration from its expert Dr. Howard that addresses each type of evidence that the Federal Circuit identified in *Diebold*.  (*See infra* at 13-18.)

To be sure, in response to the instant motion, Hyosung does not bear the burden of proving that Diebold's indefiniteness defense is baseless.  Rather, at the pleading stage, Hyosung only needs to have pled facts that place Diebold on notice of the allegations in question.  Hyosung's First Amended Complaint (Dkt. 45 ("FAC")) easily meets that standard.  It provides detailed infringement allegations, including for the "cheque standby unit" term.  Both because the FAC is well-pleaded, and because Hyosung will provide the types of evidence relevant to indefiniteness that the Federal Circuit itself identified as relevant but missing in the ITC action, the Court should not find the claims indefinite at this early stage.  The Court should deny the Motion.

## II.     PROCEDURAL BACKGROUND

Hyosung brought this suit on February 9, 2016, alleging that Diebold infringes the '235 Patent and three other patents.  (Dkt. 1.)  On March 21, 2016, the Court granted Diebold's unopposed motion for a statutory stay under 28 U.S.C. § 1659 during the co-pending ITC action (No. 337-989 ("ITC Action")).  (Dkt. 13.)  In the ITC Action, after an evidentiary hearing, the administrative law judge ("ALJ") found that Diebold infringed claims 1-3, 6, 8, and 9 of the '235 Patent and that the term "cheque standby unit" was sufficiently definite under 35 U.S.C. § 112 because a person of ordinary skill would understand that it is a structure that temporarily holds checks.  *See Diebold*, 899 F.3d at 1296.  The ALJ credited the *unrebutted* testimony of Hyosung's expert Dr. Howard regarding how a skilled artisan would understand the term "cheque standby unit" to have a structural meaning.  *Id.*  The ITC agreed, found that Diebold violated § 337 of the Tariff Act of 1930, and issued a limited exclusion order and cease and desist order.  *Id.*

On August 15. 2018, the Federal Circuit reversed.  *Id.* at 1303.  Based on the factual record in the ITC proceeding, the Federal Circuit found that the term "cheque standby unit" was invalid as indefinite under 35 U.S.C. § 112.  *Id.*  The Federal Circuit concluded that there was insufficient evidence in the ITC hearing record to show that a skilled artisan would understand that the term

connoted a structure as opposed to a mere function (thus finding the term governed by § 112, ¶ 6) and found insufficient structure in the patent specification (as required for § 112, ¶ 6 terms).  *Id.*

However, the Federal Circuit then went on to identify specific types of additional extrinsic evidence that were lacking in the ITC evidentiary record that, had they been present, could have impacted the outcome, such as:

1. Evidence that a skilled artisan would understand that "cheque standby unit" denoted specific structures or devices (or classes of structures or devices), such as an "escrow unit."

2. Evidence that such structures or devices could be made using well-known components.

3. Evidence that "escrow units" existed and were well known as of the date of the application for the '235 Patent.

*Id.* at 1300 & n.4.  At the appropriate time in this action, Hyosung will submit the type of evidence identified by the Federal Circuit (and more) so the Court or the jury can adjudicate the indefiniteness issue on the record in *this* lawsuit.  That evidence is previewed in the Howard declaration submitted herewith.  (*Infra* at 13-18; *see generally* Howard Decl.)

On March 15, 2019, at Hyosung's request, the Court lifted the stay in this action.  (Dkt. 24, 41.)  On March 27, 2019, Hyosung filed its FAC with Diebold's consent pursuant to Fed. R. Civ. P. 15(a)(2).  (*See generally* FAC.)  Hyosung's FAC alleged infringement of only the '235 Patent.  (*Id.*)  On April 11, 2019, Diebold filed the present Motion.

## III.   LEGAL STANDARD

### A.   Motions To Dismiss

In addressing a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts and view them in the light most favorable to the plaintiff.  *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).  Even if "'actual proof of [the alleged] facts'" seems "'improbable,'" the motion must be denied as long as the complaint states a claim for relief that is "'plausible on

its face.'" *Id.* at 410, 413 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also H-W Tech.*, 2012 WL 959316, at *2 ("Motions to dismiss under Rule 12(b)(6) are disfavored and rarely granted.") (citing *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981)).

### B.    Indefiniteness and Claim Construction

Issued patent claims, such as the ones here, are "presumed valid." 35 U.S.C. § 282.  "[T]he burden of proving indefiniteness, as with any allegation of invalidity, remains on the party challenging validity who must establish it by clear and convincing evidence." *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 809 F.3d 1223, 1224 (Fed. Cir. 2015).

A patent claim is definite unless it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see* 35 U.S.C. § 112, ¶ 2 (patent must end with claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention").  A claim term is definite if, for example, it is "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  "To determine whether a claim recites sufficient structure, 'it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.'" *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (citation omitted).

If a claim term lacks such structure and is phrased in purely function language, it is subject to 35 U.S.C. § 112, ¶ 6, which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*See Diebold*, 899 F.3d at 1296.  If a claim term does not use the word "means" there is a rebuttable presumption that § 112, ¶ 6 does not apply.  *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018).  Claims governed by § 112, ¶ 6 are sufficiently definite if the patent specification discloses the requisite structure to a person of ordinary skill.  *Id.* at 1303.[1]

The Federal Circuit has repeatedly recognized that extrinsic evidence and subsidiary factual findings can impact the indefiniteness and § 112, ¶ 6 inquiries.  For example, the Federal Circuit affirmed findings of indefiniteness based in part on the district courts' factual findings in cases such as *Akzo Nobel Coatings*, 811 F.3d at 1343-44, and *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018).  *See also BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("[A]ny factual findings about extrinsic evidence relevant to the question [of indefiniteness], such as evidence about knowledge of those skilled in the art, are reviewed for clear error.") (citations omitted); *EON Corp. IP Holdings LLC v. AT & T Mobility LLC*, 785 F.3d 616, 620 (Fed. Cir. 2015) (no "clear error" in district court's "numerous detailed findings of fact" on indefiniteness).

To determine whether a claim is indefinite and whether § 112, ¶ 6 applies, the Court must construe the claims to determine their meaning and scope.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1232 (Fed. Cir. 2016) ("[W]e have generally acknowledged that an indefiniteness analysis … is inextricably intertwined with claim construction.") (quotation omitted); *Zeroclick*, 891 F.3d at 1007 (§ 112, ¶ 6 inquiry "*must* be made under the traditional claim construction principles" (emphasis added)); *H-W Tech.*, 2012 WL 959316, at *3 ("[A] court cannot determine the indefiniteness or validity of a claim without construing the claim to determine its

---

[1] The pre-AIA version of § 112 applies because the '235 Patent was filed before September 16, 2012.  *Diebold*, 899 F.3d at 1296 n.2; Leahy–Smith America Invents Act, Pub. L. No. 112–29, § 4(e), 125 Stat. 284, 297 (2011).

meaning and scope."). "Claim construction generally involves looking to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification, and the prosecution history, and if proper, to extrinsic evidence such as expert testimony." *H-W Tech.*, 2012 WL 959316, at *3 (citation omitted). "The process generally entails the parties proposing their claim construction definitions, submitting their claim construction briefs, and presenting their evidence and arguments at a claim construction hearing known as a *Markman* hearing." *Id.* (citation omitted). Where "subsidiary facts are in dispute, courts will need to make subsidiary factual findings about [the] extrinsic evidence." *Teva*, 135 S. Ct. at 841. In some cases, "a factual finding may be close to dispositive of the ultimate legal question of the proper meaning of the term in the context of the patent." *Id.* at 841-42. Accordingly, the Supreme Court has recognized the possibility of "*divergent claim construction* stemming from *divergent findings of fact*." *Teva*, 135 S. Ct. at 839 (emphasis added).

### C.    Effect Of Prior ITC Actions And Appeals

"[D]ecisions of the ITC involving patent issues have no preclusive effect in other forums …." *Texas Instruments*, 90 F.3d at 1569. The same is true about appellate decisions in ITC cases: "appellate treatment of decisions of the [ITC] *does not estop fresh consideration* by other tribunals." *Tandon Corp.*, 831 F.2d at 1019 (emphasis added; citation omitted). While Federal Circuit appeals of ITC decisions are not preclusive, their rulings on points of law are entitled to *stare decisis* deference. *See Powertech Tech. Inc. v. Tessera, Inc.*, 660 F.3d 1301, 1308 (Fed. Cir. 2011).

A party in district court "can raise whatever [claims and] defenses they believe are justified, regardless whether they previously raised them and lost in the ITC." *Texas Instruments*, 90 F.3d at 1569. Similarly, the district court is not bound by a prior decision in an ITC case, even if that decision was rendered by the Federal Circuit. Instead, "[t]he district court can attribute whatever

persuasive value to the prior ITC decision that it considers justified." *Id.*  In any ensuing appeal

of the district court decision, the Federal Circuit is "bound to follow [its] own precedents, and …

will have powerful incentives not to deviate from [its own] prior holding, short of thoroughly

justified grounds." *Id.*  However, the fact that a prior ITC decision was appealed to the Federal

Circuit (1) does not preclude relitigating the issues on a different factual record in a subsequent

district court action and (2) does not preclude the subsequent district court from reaching a

different outcome. *Id.* at 1562-70.

## IV.   ARGUMENT

Diebold asks this Court to find the claims invalid as indefinite on the pleadings, even

though the underlying factual issues are heavily disputed.  Diebold's motion is premised on the

notion that the Federal Circuit definitively found the claims indefinite as a matter of law and that

a different factual record could not produce a different outcome.  Diebold's position, however, is

contrary to the law of indefiniteness (which recognizes that indefiniteness is often steeped in

factual disputes) and the Federal Circuit's decision itself (which identifies specific facts and

evidence that could impact the outcome here).  Hyosung can, and will, present precisely the type

of evidence that the Federal Circuit identified.

### A.   Indefiniteness Cannot Be Resolved On The Pleadings Where, As Here, There Are Factual Disputes

Diebold fails to cite any authority where a case was dismissed at the pleading stage based

on the alleged indefiniteness of the asserted patent.  That is not surprising.  Dismissing a case at

the pleading stage based on indefiniteness is premature and inappropriate.

This District's decision in *H-W Technology* is particularly instructive.  There, the defendant

filed a motion to dismiss arguing that certain asserted claims were indefinite.  2012 WL 959316,

at *1.  The court acknowledged that indefiniteness is ultimately a legal conclusion, but explained

that it is based on claim construction, which may involve consideration of both intrinsic evidence and "extrinsic evidence such as expert testimony." *Id.* at *3. The court determined that "dismissing the complaint on grounds of claim invalidity would be premature at best" because the parties had not engaged in the claim construction process, and "many courts have declined to construe patent claims at the motion to dismiss stage." *Id.* at *3-4.

The authority Diebold cites (Motion at 10-11) confirms that adjudicating indefiniteness on a motion to dismiss is premature. All of those cases were well-advanced and concerned decisions at the claim construction stage or on summary judgment; none was on a motion to dismiss. *See Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*, 3 F. Supp. 2d 49, 51 (D.D.C. 1998) (claim construction); *Alloc, Inc. v. Norman D. Lifton Co.*, No. 03 Civ. 4419 (PAC), 2007 WL 2089303, at *11 (S.D.N.Y. July 18, 2007) (claim construction); *Alloc, Inc. v. Pergo, Ltd. Liab. Co.*, No. 00-C-999, 2009 WL 1939034, at *4 (E.D. Wis. July 2, 2009) (claim construction); *Solomon Techs., Inc. v. Toyota Motor Corp.*, No. 8:05-cv-1702-T-MAP, 2010 WL 715243, at *1 (M.D. Fla. Jan. 26, 2010) (summary judgment).

It also is well-settled that factual disputes cannot be resolved on a motion to dismiss. *See, e.g.*, *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). Thus the impropriety of prematurely adjudicating indefiniteness on a motion to dismiss is underscored by the Federal Circuit's repeated recognition that this defense requires "a determination" of underlying and disputed factual issues. *Akzo Nobel Coatings*, 811 F.3d at 1343 ("[i]ndefiniteness is a question of law … *subject to a determination of underlying facts*" (internal citation omitted; emphasis added)); *see also, e.g.*, *Berkheimer*, 881 F.3d at 1363; *BASF Corp.*, 875 F.3d at 1365 ("factual findings about extrinsic evidence" may be "relevant to the question [of indefiniteness]") (citations omitted). Indeed, in *Zeroclick*, the Federal Circuit explained that the

indefiniteness inquiry "*must* be made under the traditional claim construction principles … in light of evidence intrinsic *and extrinsic* to the asserted patents" and vacated the district court's indefiniteness ruling because it "failed to undertake the relevant inquiry and make related factual findings to support its conclusion" that § 112, ¶ 6 applied (i.e., that sufficient structure was lacking).  891 F.3d at 1007 (emphasis added).

Here, the numerous facts set forth in the Howard declaration are relevant to the indefiniteness defense.  Diebold presumably disputes them all.  Because these factual disputes cannot be resolved at the pleading stage, Diebold's motion must be denied.

### B.    The Federal Circuit's Decision Confirms That Different Evidence Could Warrant A Different Outcome

Diebold argues that the appellate decision in the ITC case "require[s] this Court to find that the '235 Patent is invalid" because, purportedly, the Federal Circuit found the claims were indefinite as a pure matter of law regardless of any fact development.  (Motion at 12.)  Diebold is wrong for two reasons.

First, as noted, the Federal Circuit has long held that "appellate treatment of decisions of the [ITC] does not estop fresh consideration by other tribunals."  *Tandon Corp.*, 831 F.2d at 1019 (citation omitted).  This alone refutes Diebold's position.

Second, the Federal Circuit's decision in *Diebold* identified specific evidence that could have impacted its decision on indefiniteness had such evidence been present in the ITC record.  This identification of evidence, when viewed in light of the holding in *Tandon Corp.*, necessarily means that this Court must consider such new evidence, if presented here, to resolve the indefiniteness defense in this case.  And, as previewed in the Howard declaration, such evidence *will* be presented in this case at the appropriate time.  (*See infra* at 13-18.)  Because such evidence cannot be considered on a motion to dismiss, it must necessarily be considered later in this case:

at claim construction, summary judgment, and/or trial.  That it must be considered later before resolving the indefiniteness issue also, and separately, requires that Diebold's Motion be denied.

Diebold attempts to rely on *Texas Instruments* and the principle that a subsequent Federal Circuit panel reviewing a district court decision "will have powerful incentives not to deviate from" a prior panel's review of an ITC decision "short of thoroughly justified grounds."  90 F.3d at 1569.  (Motion at 10.)  Diebold's reliance is misplaced for two reasons.

First, it is axiomatic that this Court cannot determine whether there are "thoroughly justified grounds" for reaching a different conclusion on the indefiniteness issue until after it can evaluate a fully-developed factual record that includes the evidence set forth in the Howard declaration.  As explained above, however, that evidence cannot be considered on a motion to dismiss.  Thus *Texas Instruments* compels the conclusion that the decision—whether or not to deviate from the Federal Circuit's prior decision on indefiniteness—cannot be made on a motion to dismiss.  *Texas Instruments* does not support Diebold's position.

Second, the outcome, i.e., holding, in *Texas Instruments* (which Diebold ignores) illustrates the fallacy of Diebold's invitation to slavishly follow the Federal Circuit's indefiniteness ruling on a motion to dismiss, before the full factual record on that issue is developed and considered in this case.  The Court will note that in *Texas Instruments*, the ITC held the asserted patent infringed and the Federal Circuit affirmed.  90 F.3d at 1562-63.  Yet in the subsequent district court case, the Federal Circuit reached the opposite conclusion and affirmed a judgment of non-infringement entered by the district court.  *Id*. at 1570.  In other words, even though the parties, the patent, and the accused product were identical in both the ITC case and the district court case, the Federal Circuit reached diametrically opposed conclusions.  Why this seemingly anomalous result?  As the Federal Circuit explained, there is no anomaly because its earlier decision affirming the ITC

finding of infringement did not prevent the patentee from relitigating the same issue in the district court on a different record and the earlier appellate ruling did not compel the same outcome on that same issue. *Id.* at 1569-70; *see also Teva*, 135 S. Ct. at 839 (recognizing possibility of "divergent claim construction stemming from divergent findings of fact"); *InterDigital Commc'ns, Inc. v. ZTE Corp.*, 711 F. App'x 998 (Fed. Cir. 2017) (affirming broad district court construction despite Federal Circuit's prior affirmance of narrower ITC construction of equivalent term where different arguments raised on a different evidentiary record).

Far from supporting Diebold's erroneous contention that a prior Federal Circuit decision on indefiniteness in an ITC proceeding must be slavishly followed on a motion to dismiss in federal court, *Texas Instruments* confirm the folly of that position. Diebold's motion invites this Court to make a clear legal error.

Diebold's remaining cited cases further confirm that the Federal Circuit's indefiniteness finding does not command the same result on a different record. For example, Diebold quotes *Alloc*, 2007 WL 2089303, at *10, for the proposition that "a district court should afford Federal Circuit claim interpretation on appeal from the ITC a strong presumption of correctness, and deviate only where the party advancing an alternative interpretation provides compelling reasons to do so." (Motion at 11.) But Diebold omits the next sentence, which explains that "[s]uch reasons [to deviate from the prior Federal Circuit decision] might include *evidence or arguments not presented to the Circuit panel*." *Alloc*, 2007 WL 2089303, at *11 (emphasis added). The other *Alloc* case cited by Diebold likewise confirms that different "evidence" may provide "thoroughly justified grounds" to reach a different outcome. 2009 WL 1939034, at *4 (citation and quotation marks omitted). Although Hyosung is not required to set forth that evidence at this stage, Hyosung can readily confirm for the Court that there will be such different evidence here.

**C.      Hyosung Will Submit Precisely The Evidence That The Federal Circuit Found Lacking In The ITC Record**

Even at this preliminary stage of the litigation, Hyosung has identified significant factual extrinsic evidence addressing the Federal Circuit's identified deficiencies in the ITC factual record. In particular, Hyosung has attached a declaration from its expert, Dr. Howard, addressing various pieces of extrinsic evidence and explaining how, as used in the '235 Patent, "cheque standby unit" would be "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Diebold*, 899 F.3d at 1297 (citation omitted).[2]

In the ITC appeal, the Federal Circuit identified several specific types of evidence that could have affected the outcome, but that were absent from the ITC factual record. In that case, Hyosung and Dr. Howard did not believe it was necessary to present additional evidence because, in their view, the evidence explaining why a skilled artisan would have understood the claim term to have sufficient structure was effectively unrebutted by Diebold. The ITC agreed and found that Diebold had failed to prove that the claims of the '235 Patent were indefinite. *See Diebold*, 899 F.3d at 1296. The Federal Circuit, however, disagreed and provided guidance on the types of evidence that would support Hyosung's argument. *See id.* at 1300. With the benefit of the Federal Circuit's guidance, Hyosung will submit such evidence in this case.

First, the Federal Circuit stated that Dr. Howard's ITC testimony did not "explain with any degree of definiteness what structure or class of structures a person of ordinary skill would understand the term ['cheque standby unit'] to encompass" and that "Hyosung did not introduce,

---

[2] Hyosung does not believe that providing this level of evidence or detail is necessary at the pleading stage, but submits Dr. Howard's declaration to illustrate the types of evidence that Hyosung expects to present at claim construction and beyond. Hyosung reserves the right to supplement or modify the record as the case progresses.

---

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**                                    **Page 13**

any other evidence … suggesting that 'cheque standby unit' is a term commonly understood by persons of ordinary skill in the art to denote a device or class of devices." 899 F.3d at 1300.

Hyosung will introduce precisely such evidence here.  In his declaration, Dr. Howard provides the missing "explanation" and demonstrates that a person of ordinary skill in the art would understand "cheque standby unit" to encompass two specific structures or classes of structures for temporarily holding banknotes (among other functions): (a) drum structures and (b) stacking structures.  (*See* Howard Decl., at ¶¶ 4, 21.)  Dr. Howard reaches this conclusion based on analyzing a *dozen* patents and publications, which commonly refer to such well-known devices as "escrow units," "escrows," "note storage modules," or other like terms.  (*See, e.g*., Howard Decl., at ¶¶ 22-25; Ex. 12, U.S. Pat. No. 6,454,163 ("escrow device"); Ex. 4, U.S. Pat. No. 5,874,682 (same); Ex. 1, 2003 Wincor Nixdorf CCDM V1 Service Manual ("escrow" and "escrow unit"); Ex. 2, 2005 Wincor Nixdorf CCDM V1 Service Manual ("same").)[3]  For example, a 2003 product manual (from Diebold's predecessor) describes an "escrow unit" with a specific drum structure as follows:

---

[3] Dr. Howard explains that the "drum" structure is disclosed in six contemporaneous patents, the 2003 and 2005 Wincor Nixdorf CCDM Service Manuals, and other publications (Howard Decl., at ¶¶ 34-86), and explains that the "stacking" structure is disclosed in two patents (*id.* ¶¶ 87-100).



(*See* Howard Decl., at ¶ 39; Ex. 1, 2003 Wincor Nixdorf CCDM Service Manual, at 4-5.)

Second, the Federal Circuit stated that Dr. Howard "did not explain what 'well-known components' a skilled artisan would understand could be used to design a 'cheque standby unit.'" 899 F.3d at 1300.  Now, however, Dr. Howard has broken down in detail the well-known components used to design the drum structures and stacking structures.  For example, he explains that a drum type structure can be designed using well-known components such as a drum with a motor, sensors, clutches, tape, and guide rollers, as in the escrow unit depicted in the 2003 product manual above.  (Howard Decl., at ¶ 26.)  And he explains that the stacking structures can be designed using well-known components such as entry slots, shutters, guides, motors, sensors, and friction pick mechanisms.  (*Id.* ¶ 27.)

Third, the Federal Circuit stated that there was no evidence that "escrow units" or similar devices existed and were well known as of 2006—the date of the application for the '235 Patent. But, here, Dr. Howard testifies that, at that time, "there were numerous publications discussing the structure of 'escrow units' (and similar devices) and their incorporation in devices on the market" and discusses numerous contemporaneous patents and publications, including service manuals

from Diebold's predecessor.  (Howard Decl., at ¶ 25 (citing, among others, Ex. 1, 2003 Wincor Nixdorf CCDM V1 Service Manual; Ex. 2, 2005 Wincor Nixdorf CCDM V1 Service Manual; Ex. 12, U.S. Pat. No. 6,454,163; Ex. 4, U.S. Pat. No. 5,874,682.)

The following chart illustrates how Dr. Howard's testimony and other evidence in this case addresses each of the evidentiary categories identified by the Federal Circuit:

| Types of Evidence Federal Circuit Identified as Missing | Dr. Howard's Declaration and Other Evidence |
| --- | --- |
| Evidence showing that a person of ordinary skill understood "cheque standby unit" to "encompass" or "denote" a "structure or class of structures" or "a device or class of devices."<br><br>*Diebold*, 899 F.3d at 1300. | "A person of ordinary skill in the art would understand that the 'cheque standby unit' in the claims of the '235 Patent encompasses two structures (or classes of structure): (1) drum structures and (2) stacking structures." (Howard Decl., at ¶ 21.)<br><br>The term "would have been commonly understood by persons of ordinary skill in the art to denote a device or class of devices" and were "referred to by multiple names in the literature (e.g. 'escrow,' 'escrow unit,' 'note storage module,' 'temporary stacker,' 'temporary storage box,' 'temporary collection section,' and 'auxiliary storage device.')." (*Id.* ¶ 29.)<br><br>"As one example, the 2003 Wincor Nixdorf CCDM V1 Service Manual [from Diebold's predecessor] describes an 'escrow unit' with a drum structure which includes, among other structural components, a drum with a stepper motor, multiple sensors, tape, one or more clutches, and one or more deflecting guide rollers." (*Id.* ¶ 26.)<br><br><br><br>(*Id.* ¶¶ 39, 41.) |
| Evidence showing "how the fact that the 'cheque standby | "[T]he fact that the 'cheque standby unit' must 'interface with the main transfer path' dictates aspects of the structure of the |

| | |
|---|---|
| unit' must 'interface with the main transfer path' dictates … the unit's structure."<br><br>*Diebold*, 899 F.3d at 1300. | 'cheque standby unit.'  For example, the structure must have one or more openings to allow the banknotes to pass through to other parts of the main transfer path."  (*Id.* ¶ 28.) |
| Expert testimony explaining "what 'well-known components' a skilled artisan would understand could be used to design a 'cheque standby unit.'"<br><br>*Diebold*, 899 F.3d at 1300. | "[A] skilled artisan would understand that a 'cheque standby unit' (or on 'escrow unit' or similar device) could be designed using well-known components.  For example, a 'cheque standby unit' (or an 'escrow unit' or similar device) with a drum structure would typically include a drum with a motor, one or more sensors, one or more clutches, tape, and one or more guide rollers."<br><br>(Howard Decl., at ¶ 26 (citing 2003 service manual from Diebold's predecessor).) |
| Evidence that "escrow units" existed and were well known as of the date of the application for the '235 Patent and had a specific, structural meaning to persons of ordinary skill in the art, akin to words like "brake," "lock," and "screwdriver."<br><br>*Diebold*, 899 F.3d at 1300 & n.4. | "[T]he earliest priority date for the '235 Patent is February 3, 2006.  By that date, there were numerous publications discussing the structure of 'escrow units' (and similar devices) and their incorporation in devices on the market.  *See, e.g.*, 2003 Wincor Nixdorf CCDM V1 Service Manual, 2005 Wincor Nixdorf CCDM V1 Service Manual, U.S. Pat. No. 6,454,163, U.S. Pat. No. 5,874,682 ('escrow device')…."<br><br>(Howard Decl., at ¶ 25.)<br><br>"In my opinion, a person of ordinary skill would understand that the term 'cheque standby unit' (or 'escrow unit') refers to a device for the temporary storage of banknotes (among other functions) that falls within two structures or classes of structure: (1) drum structures, and (2) stacking structures.  As noted above, other terms were sometimes utilized in the art to refer to the same types of structures."<br><br>(Howard Decl., at ¶ 101.) |

Diebold argues that any such evidence about escrow units is irrelevant because the claim term is "'cheque standby unit,' *not* 'escrow' unit" and Hyosung was "unwilling to limit the term 'cheque standby unit' to an 'escrow' unit" in the ITC action.  (Motion at 7.)  That misses the point.  Hyosung's position is not (and was not) that a "cheque standby unit" can only be something labeled an "escrow unit."  Rather, as Dr. Howard explains—in precisely the level of detail that the Federal

Circuit found lacking in *Diebold*—there is ample contemporary evidence (including from Diebold's predecessor) that a skilled artisan would understand that a "cheque standby unit" denotes specific devices or structures or classes thereof (drums or stacking structures), that they could be made with well-known components (such as motors, sensors, clutches, tape, and guide rollers), and that there were prominent and commonplace examples (such as an "escrow" unit) available at the relevant time.[4]

In summary, the Federal Circuit identified gaps in the ITC record and provided a roadmap for the types of extrinsic evidence and expert testimony that could fill those gaps. Hyosung has already developed evidence and testimony to fill each gap identified by the Federal Circuit, as demonstrated by Dr. Howard's declaration and other extrinsic evidence, and anticipates that additional evidence may be developed as the case progresses. Consequently, not only is this Court permitted to reach a different conclusion on the indefiniteness issue in the context of claim construction proceedings or summary judgment, there are "thoroughly justified grounds" for doing so. *Texas Instruments*, 90 F.3d at 1569. At a minimum, Dr. Howard's declaration and the other evidence in this case confirm that, even at this preliminary stage, there are entrenched factual disputes that preclude granting Diebold's Motion.

---

[4] Diebold's reliance on a statement in Dr. Howard's prior testimony about the term language being "'broad enough to cover structures as distinct as a suction cup, a trapdoor, and a drum'" (Motion at 7 (citation omitted)) also misses the mark. Diebold is free to question Dr. Howard about that in a deposition or at trial and Dr. Howard is free to explain the context and what he meant. Also, regardless of the record in that case, Dr. Howard has clarified and explained with specificity in this case why a person of ordinary skill would understand the term to denote sufficient structure. All of that proves the point: it is premature to prejudge those factual questions at the pleading stage.

---

### D.      Hyosung Properly Pleaded Infringement

Saving least for last, Diebold  suggests that the FAC fails to plead sufficient facts to avoid indefiniteness:  the FAC "is silent regarding the Federal Circuit opinion and does not provide any specific factual allegations regarding the 'cheque standby unit.'"  (Motion at 8.)  This argument is baseless and asks the Court to turn the parties' respective burdens on their heads.  It is *Diebold's* burden to prove its affirmative defenses by clear and convincing evidence.  It is not *Hyosung's* burden to plead facts *disproving* such potential defenses.  Instead, the complaint only needs to "place the alleged infringer on notice of what activity … is being accused of infringement"— "[t]here is no requirement for [a plaintiff] to prove its case at the pleading stage." *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017) (citations and internal quotation marks omitted); *see also Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (similar).

The FAC more than satisfies the correct legal standard.  Among other things, it identifies multiple Diebold products that infringe the '235 Patent, identifies multiple claims that are infringed, and further alleges that "[t]he '235 Patent is valid, enforceable, and is currently in full force and effect"—an allegation that must be accepted as true on a motion to dismiss.  (FAC ¶¶ 10, 19-20.)  But the FAC goes further, beyond the requisite legal standard, and includes a detailed 28-page claim chart demonstrating how Diebold's products infringe an exemplary claim of the '235 Patent.  (Dkt. 45-3.)  That claim chart includes detailed factual allegations related to the "cheque standby unit" limitation:

---

| | |
|---|---|
| 1[m] a cheque standby unit placed in the main transfer path between the first gate and the second gate, the cheque standby unit configured to hold the at least one authentic cheque to return the at least one authentic cheque to the user responsive to receiving user instructions cancelling depositing of the at least one authentic cheque; and | Diebold ATMs including Diebold's ActivMedia module / CCDM v2 include a cheque standby unit placed in the main transfer path between the first gate and the second gate, the cheque standby unit configured to hold the at least one authentic cheque to return the at least one authentic cheque to the user responsive to receiving user instructions cancelling depositing of the at least one authentic cheque.<br><br>ActivMedia includes an Escrow Drum that temporarily stores notes during the deposit transaction and returns them to the user if the transaction is cancelled.  The Escrow Drum is configured between the first and second gates.<br><br><br><br>Picture of the exemplary Diebold ActivMedia module (annotated). |

(*Id.* at 26-27.)

Notably, the Motion fails to identify any purported deficiency in the infringement allegations as pleaded in the FAC.  That failure confirms that the FAC satisfies the pleading standard.  Nevertheless,  if the Court is inclined to grant the motion, Hyosung respectfully requests leave to amend so that its pleading can include the types of facts set forth in Dr. Howard's declaration.  *See* Fed. R. Civ. P. 15(a)(2) (leave should be "freely give[n]"); *Aatrix Software*, 882 F.3d at 1128 (district court should have granted leave to amend).

## V.    CONCLUSION

For the reasons set forth above, Hyosung respectfully requests that the Court deny Diebold's Motion.

Date:   May 9, 2019                    Respectfully submitted,

                                       /s/ Eric W. Pinker, P.C.
                                       Eric W. Pinker, P.C.
                                       State Bar No. 16016550
                                       epinker@lynnllp.com
                                       Christopher J. Schwegmann
                                       State Bar No. 24051315
                                       cschwegmann@lynnllp.com
                                       Jared D. Eisenberg
                                       State Bar No. 24092382
                                       jeisenberg@lynnllp.com
                                       **LYNN PINKER COX & HURST, LLP**
                                       2100 Ross Avenue, Suite 2700
                                       Dallas, Texas 75201
                                       Telephone: 214-981-3800
                                       Facsimile: 214-981-3839

                                       Maximilian A. Grant (DC Bar No. 481610)
                                       (*pro hac vice*)
                                       Kevin C. Wheeler (DC Bar No. 992118)
                                       (*pro hac vice*)
                                       Gabriel K. Bell (DC Bar No. 987112)
                                       (*pro hac vice*)
                                       LATHAM & WATKINS LLP
                                       555 Eleventh Street, NW, Suite 1000
                                       Washington, DC 20004
                                       Telephone:  (202) 637-2200
                                       Facsimile:  (202) 637-2201
                                       max.grant@lw.com
                                       kevin.wheeler@lw.com
                                       gabriel.bell@lw.com

                                       Giri Pathmanaban
                                       State Bar No. 24074865
                                       LATHAM & WATKINS LLP
                                       140 Scott Drive
                                       Menlo Park, CA 94025
                                       Telephone:  (650) 470-4851
                                       Facsimile:  (650) 463-2600
                                       giri.pathmanaban@lw.com

                                       **COUNSEL FOR PLAINTIFF**
                                       **NAUTILUS HYOSUNG INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all CM/ECF participants.  I further certify that I have served via e-mail PDF to all non-CM/ECF participants.

<u>/s/ Eric W. Pinker, P.C.</u>
Eric W. Pinker, P.C.